Good morning, your honors. May it please the court, my name is Rachel Fazio, and I am the attorney for the Appellants Earth Island Institute, and at this time I'd like to reserve three minutes for rebuttal, and I'll try and keep track of my time as well. Okay. And I'm referring to the defendant's response on the 28J letter that we submitted last week. I don't know if you've had a chance to look at that. Okay. That doesn't look like you're going to find out. I guess so. Okay, so in this circumstance, de novo review is necessary on plaintiff's three main claims. The NIFMA viability claim, the NIFMA hazard tree marking guidelines claim, and on plaintiff's NEPA claim for failure to respond to dissenting scientific opinion. This is because the district court committed legal errors in ruling on each of those three claims. Specifically for the NIFMA viability claim, the district court found as a matter of law that the information provided by the government and compliance with their own 2007 MIS amendments satisfied their obligation to ensure the viability of the blackback woodpecker. But this is an erroneous conclusion of law. The case law, which is based upon the definition of viability in the 1982 regulations, clearly establishes the information that the Forest Service must provide in order to ensure the viability of the species. The NIFMA hazard tree marking guidelines. Are you going to take them up one by one? Well, I was just going to point out the fact that there were legal errors with regard to all three of these. Yeah, but what is the legal error? What did they do wrong on the viability claim? Well, the legal error of the district court is that it found that what the Forest Service had done, what the information they had provided, was sufficient to meet NIFMA's viability requirement. So under the National Forest Management Act, the Forest Service is required to ensure the viability of all native vertebrate species. This specific requirement was incorporated into the forest plan at issue here and thus is enforceable, just as it was enforceable in McNair v. Lands Council, the recent en banc decision. Actually, this fire has increased the area for the viability of those species. While it is true that this fire created habitat that would be suitable for this species, the foundational information to figure out whether or not the viability is being affected is currently being ensured. If it's already critically low, if this habitat has improved the chances for viability, that information is missing from the record. So there's no way to conclude that just because this fire burned and created habitat that would be suitable for the blackback woodpecker, therefore viability is not being threatened. And in fact, the Forest Service never made a determination, even though they're required to by law, that viability is being ensured or viability is being threatened. So... Is there a dispute as to whether that determination, if there is one, can be made on a project basis or on a plan-wide basis? The actual determination needs to be made for the whole planning area. So the determination needs to be made for this entire Sierra Nevada. Plaintiffs brought up in their comments on this RFEIS that there is so little habitat right now in the Sierra Nevada that logging the Moonlight Wheeler Logging Project will threaten the viability of the blackback woodpecker. And the Forest Service is required to figure out in the planning area the quantity and quality of habitat that is necessary to support a population of vertebrate species, in this case the blackback woodpecker, such that this bird can persist in the project area over time. It maintains its viability. Because that information is missing from the record, you cannot say there's no factual foundation to assert that just because a new fire burned, that there are sufficient acres to support viability, because no viability assessment has been made. This species is very... is actually, even according to the defendants, in decline. Most of the areas that burn in the National Forest System are salvage logged after they burn. So the habitat that is created is immediately chopped down and is not available. This bird only uses burned areas for one to six years post-fire, so the habitat is very ephemeral. So even if you had a fire ten years ago and you're like, well, hey, there was a fire ten years ago, that's blackback habitat, why can't we log this one here? That ceased being blackback woodpecker habitat four years ago. So there is a need in order to meet the requirements of the law for the Forest Service to make a threshold determination on how many acres in the planning area exist that are currently suitable, how many acres are needed for a breeding pair of birds, and how many birds are needed for a viable population. All three of those pieces of information are missing from the record. There is no rational basis... Whether it's their obligation to determine viability or as opposed to just monitoring the... They have two things. One is to monitor habitat and one is to determine viability. There are two separate and distinct requirements. The only... Is there a dispute about whether the Forest Service must meet both as opposed to just the habitat requirement? In the law, I do not believe there's a dispute. Apparently, the Forest Service seems to think that what they did on this project was just fine. Well, was that because it thought it only had to monitor habitat and no longer had to determine viability? I don't think they could have reasonably thought that because the MI... I don't know whether it was reasonable. If you don't know the answer, just tell me you don't know. I'm trying to figure out what the issue really is. Well, the issue is... The issue is, is the information contained in the environmental impact statement sufficient to support or meet the Forest Service's obligation to ensure viability? Well, do you disagree on what it's... There's no disagreement about what's in the record. No, I don't. Okay, there's... Well, I have the impression there was a disability... a disagreement about whether the 2007 amendment changed the obligation of the Forest Service. The 2007 amendment only pertained to monitoring MIS species. So 219.19A1 and A6, which are distinct provisions of the 82 regulations that deal with choosing your management indicator species and monitoring them. There is a whole separate distinct requirement in the Forest Plan.  On viability. And meeting one does not mean that you meet the other. I understand. That's your position. I'm trying to find out if the Forest Service or the district court has a different view of the effect. Yes, yes. Okay. So there is a disagreement about their obligation under the 2007 amendment. I guess so. But I didn't take their... I did not take the arguments in the Forest Service's brief, and hopefully you'll ask them, to say that they no longer have to ensure viability of vertebrate species, especially because the 2007 MIS amendment specifically said, this does not alter our obligation to ensure viability of the species. So I... Yeah, we disagree. There's no way the 2007 MIS amendment abrogated their duty to ensure the viability of the species. And the information necessary to know whether or not they're meeting that obligation is simply missing from this EIS. So I wanted just to spend a second on the Monsanto v. Gersten issue of the evidentiary hearing. We've requested that this court either remand with instructions to issue an injunction or issue an injunction itself. The defendants have asserted that this court is not allowed to do that, and such would not be proper because there is a requirement for an evidentiary hearing to be had before an injunction issued. This stems from the Inree Charlton case where it says that if you have a circumstance where no material facts are at issue, that no evidentiary hearing is required. And we submit that there are not material facts at issue in this case regarding the three main claims, such that an evidentiary hearing would be required. The NFMA viability requirement, the law is clear on what is required. Lands Council v. McNair, Casta Native Ecology Center, the information is not in these documents. No testimony is necessary in the district court to figure anything out. This is a record review case. The government is consistently insisting that we're not entitled to a trial, and so I'm a little bit perplexed by their insistence that now, anytime anything's going to happen, we have to have an evidentiary hearing. I looked at some of the cases cited in the Inree Charlton case, which is a Ninth Circuit case, found at 841 F. 2nd, 988, Ninth Circuit, 1988. And these are Second, Sixth, and Seventh Circuit cases. There aren't that many in the Ninth Circuit. But they found that an evidentiary hearing was required when knowledge and intent of an individual is necessary to make a determination. So that's something that can only be established with a hearing, and that the facts that need to be in question are basically the same as with summary judgment. They have to be material facts at issue. There's also case law in the Second Circuit. So you want to save three or two minutes? I guess we're going for two. There's also case law in the Second Circuit that says that when both parties rely upon affidavits rather than insisting or requesting an evidentiary hearing, then they must live with that choice. And in this case, both plaintiffs and defendant filed substantial declarations regarding the issues in the case regarding the harm. And because of that, they can't now insist that the Ninth Circuit is restrained because they want to go back to the district court to have an evidentiary hearing. And that was Seams Motor v. Ford Motor Company, 429 F. 2nd, 1197, at 1205. Okay. I think you better stop. All right. Thank you. Thank you. May it please the Court, I am David Shilton. I'm here representing the U.S. Forest Service. With me at council table is Rito Ahuja from the United States Department of Agriculture General Counsel's Office. I first want to just talk about the scope of review here. This is a review of a preliminary injunction denial, and as such, the appropriate scope of review is abuse of discretion. Now, it's certainly true. Abuse of discretion is an error of law. That an error of law, if there has been one, that that is an abuse of discretion. But I think the context is important here, that this preliminary injunction motion was brought, briefed, argued, and decided all within one month of this case being of the complaint being filed. It was, as the district court mentioned, he had 15 days after close of briefing, and the full record had not been submitted. He was able to do a very thorough review of all of the plaintiff's many contentions and I think got the law right on everything. But... That's the issue, right? That is the issue. And he got the law right on the viability issue. Now, I think... What is that issue? Is there a dispute between you as to whether the 2007 amendment changed your obligation on the viability? Well, the 2007, let me sort of go back to basic principles here. What is important is what is in the forest plan. The viability regulation, it was a 1982 regulation. That's where this viability requirement comes from. That regulation has been repealed, as was noted by this court in McNair. However, it lives on in some form if it has been incorporated into a forest plan in a way that imposes a requirement on a project level decision. So the question is, for this project level decision, what does the forest plan require? And as amended in 2007, the forest plan requires that the Forest Service assess the habitat of management indicator species. One of those species is the blackback woodpecker. The plaintiff in 2007, was the 1982 obligation incorporated in this forest plan through the various amendments up to 2007? There was not a viability requirement incorporated so that it applied at the project level to require what plaintiffs are saying it requires. Well, generally, whatever they say, did it require both an assessment and a viability obligation? It requires assessment of habitat at the project level and a consideration of population at the planning level, which is the Sierra Nevada Mountains. And the Forest Service has done both. The Forest Service has looked at the habitat in the project level and said that suitable habitat is going to increase over what it was before the fire, because before the fire, there were 1,500 acres of good burned habitat for this bird. And after the project, there will be more than 20,000. And so at the project level, the habitat is good. And we expect that the number of blackback woodpeckers will increase. Everything is good there. With respect to the planning level, the Sierra Nevadas in general, the Forest Service here pointed to the fact that all of the evidence shows that the blackback woodpeckers are well distributed through the Sierras. They pointed to a recent study, the Segal study. That's included in plaintiff's excerpts of record at, I believe, tab 17. Are you saying the 2007 amendment didn't change anything? It clarified that the management indicator species requirement for projects in the Sierra Nevadas is to assess habitat. Now, I think the previous iterations of the plan were simply not clear on what is required at the project level, but this clarified that it's to assess habitat. But I think what ---- It clarified the assessment portion. Well, that the assessment would satisfy the Forest Service's obligation under the statute. The statute requires that the Forest Service provide a diversity of habitat for plant and animal communities. Very, very broad. The 1982 regulation was an attempt to implement that in a way that focused on species viability. Forest Service found that didn't really work, and so that's why it repealed that regulation in 2000. But to the extent that forest plans still incorporate any requirements regarding species viability or species diversity, the Forest Service projects have to be consistent with them. What this project has to be consistent with is the requirement that the Forest Service assess the habitat of the particular management indicator species. But I think what I want to stress is that the Forest Service looked at more than just the habitat in the area. It also did consider the population of the blackback woodpecker throughout the Sierras and found that the distribution of the blackback woodpecker was stable, that the studies had shown that it is being found in other forests that have burned forests within them. They found them as far south as Sequoia National Forest, as far north as Lassen National Forest. And so the Forest Service is confident, based on that, that the blackback woodpecker is doing fine, that it's going to have enough habitat in this area. And that's all that's required by the National Forest Management Act. And so the district court got the law right there and also recognized that under McNair and similar cases that these are scientific predictions that the agency has to make. Are there findings as to the quality and quantity of the specific areas, the planning and the explanation of the methodology? I think you're getting at it. This is where we, I think, differ from the plaintiffs the most, is whether it is also required for the Forest Service to make findings about thresholds, viability thresholds. The plaintiffs say that the Forest Service needs to make a finding about what the critical threshold is for any particular management indicator species, whereas if they go below that, they're no longer viable. We say that no, that is not a requirement because you cannot find that anywhere in the relevant forest plan. Where the plaintiffs get that from is some language in the McNair case. And the McNair case is different because it was a case where the agency, with the Forest Service, was totally relying on habitat as a proxy for a population. And the court said if you're going to do that, that proxy on proxy analysis has to have a reasonable explanation and you need to tell us why we can be confident that a certain amount of habitat actually relates to sufficient population of that management indicator species. It didn't say you have to make a finding. It just said you have to provide enough explanation so that we know that you are not being arbitrary and capricious. Here, there's no need to use habitat completely as a proxy for population because you have evidence and surveys that the population of the blackback woodpecker is well distributed throughout the planning area. So I don't think that McNair's and Castaneda directly apply because we're not using pure proxy on proxy. But I would also point out that in both of those cases, the court made clear that the requirement has to come from the particular forest plan and that the Forest Service is entitled to deference in deciding how it's going to show the court that it has complied. And the court can't impose a particular way of the Forest Service showing how it's complied. So I think those cases are actually supportive of our ‑‑ well distributed throughout the area. Does it show what quantity of these burned areas are required for the survival of the species? The studies, including, say, the seagull study, does show the acreage of burned forest in these other national forests. But the Forest Service has not said throughout the Sierras X number of acres is required for this species. And that's, again, where we differ from plaintiffs. I mean, that would really not be a very helpful number anyway. I mean, how a particular species does depends on a lot of other things besides the strict acreage. But, again, there's no requirement in the forest plan that the Forest Service come up with that exact sort of acreage, sort of threshold. So I think that the approach taken by the Forest Service here was a reasonable approach, consistent with the forest plan. Are you saying there's no requirement to show viability? Well, viability can mean a number of different things. And the viability requirement is determined by the forest plan and how it applies at the project level. And so what the Forest Service has to do here at the project level to comply with its viability responsibilities is to assess the habitat of management indicator species, and it has done that. It has also, as I've said, looked at the population throughout the planning area, and that further shows that it's being responsible in making sure that this particular management indicator species is not being hurt. What, if any, difference should be given to the Forest Service as to whether or not it is complying with its plan? I think the cases have said that if there is a question about the proper interpretation of the plan, that the Forest Service is given deference in how it interprets the plan, the same sort of deference it would get in interpreting its own regulation. And if the Forest Service has come up with a particular scientific method to show that habitat is adequate, that that scientific method, I think, also gets deference. So there is deference in that scope. I want to just refer to the question about evidentiary hearings. We certainly did not mean to suggest in our response to the 28J letter that injunctions require, would necessarily require live testimony at a hearing. Our point is this, that if this court were to find that there was an error of law, what would be the appropriate thing to do then would be to remand to the district court so the district court could decide, given that, is injunctive relief appropriate? Because the district court has access to all the facts as they are currently on the ground, can reassess the equities. We were simply saying that if this court were to find there were an error of law, and we certainly do not think there was, that this court should not itself decide whether an injunction should issue. And the case we cited, Sierra Forest Legacy v. Ray, which is a post-winter case, says that very thing, that these sorts of questions are for the district court to decide, not this court. So that was the only point we were trying to make there. There is a case pending in the Supreme Court on injunctions and NEPA, but we just wanted to alert the court to that, but we're not suggesting anything more than what I've just said. Is the issue that's faced by the district court and by us whether the Forest Service has complied with its own plan? Yes, that's certainly one of the issues. Just one, or is that the issue? Well, the district court had a lot of issues before in determining whether plaintiffs had shown a likelihood of success on the merits. The compliance with the forest plan certainly related to this blackback woodpecker issue and also to some of the other issues plaintiffs raised, the tree marking issue. So that's one issue that the court considers in deciding the appropriateness of preliminary injunctive relief, along with irreparable harm, the harm to defendants and the public. My question is basically are we deciding here whether there is compliance with the Forest Service's plan for the overall forest, or are we deciding issues beyond that, such as is there compliance with the statute? Okay, I understand. No, I think you should focus on whether there is compliance with the plan. Well, when you say focus on, that's the only issue. On the National Forest Management Act claim on the blackback woodpecker, yes. Okay. Thank you. Thank you. Could you answer two questions in your two minutes? Oh, sure. One is Judge Hugg's question. Is the real issue before us on the merits issue whether the Forest Service complied with its plan when it made this project determination? And two, whatever the issue is, after you answer that, in what way have they not done what you think they should do? Where do you find the violation? Very specifically, if you can. Okay. Yes, with regard to the NIFMA viability claim and with the hazard tree marking guidelines, the issue is did the Forest Service comply with their forest plan? And in this case, there is the Plumas National Forest. Could you repeat the two things that you were concerned about? One was the Forest Service. The National Forest Management Act with regard to ensuring the viability of native vertebrate species, which the blackback woodpecker is one. And the issue of whether or not the Forest Service – well, there's two parts. Whether or not the hazard tree marking guidelines are enforceable because they were incorporated into the forest plan and into the record of decision. And a subpart to that is whether or not the Forest Service complied with those marking tree guidelines. Okay. Start with the first one. The NIFMA viability. Yeah. What did they fail to do on the viability question? Okay. Well, I'm going to take this opportunity to try and bring the Court to an understanding of where the requirement stems from and why it is they failed to follow it. In the 1988 Plumas National Forest Land and Resource Management Plan, it clearly states that the direction of the Fish and Wildlife Program is to maintain at least viable populations of all native vertebrate species. In our case, the blackback woodpecker is an MIS species, which means it's a bellwether for all the species that depend upon and need burn forests for survival. But when you're dealing with whether or not the viability is being ensured, whether it's MIS or not is immaterial. It simply needs to be a native vertebrate species and either MIS or sensitive or in some way. How did they fail to comply with that requirement? They failed to comply because the 1988 plan incorporated the 1982 regulation regarding species viability. So even though the 82 regulation is now defunct, it applies in this case because just like in McNair and Castaneda, it was incorporated into the forest plan. The case law, which really began with the Seattle Audubon Society, the Evans case, which dealt with the northern spotted owl, and it was also- Before you go to the case law, though, what is it that the Forest Service failed to do? What should they have done here that they didn't do? The Forest Service should have figured out, in the planning area, the quality and quantity of habitat necessary to support viable populations of the blackback woodpecker. They needed to figure out what their number was, what the threshold, the critical threshold is to make sure the species doesn't head towards extinction, and they need to figure out if they have enough habitat right now in the planning area. I understood the government to say that before the fire there were 1,500 acres of habitat, and after the fire there were some 10,000 acres of habitat. No. Before the fire there weren't 1,500 acres because there was no burned area in the project area. I don't know where they're getting that- We had less than 1,500 acres before the fire? You know, I'd love to answer that question for you, except the Forest Service hasn't done its job. We do not know how much suitable habitat exists in the planning area for the blackback woodpecker. We do not know how many blackback woodpeckers exist. We do not know how many blackback woodpeckers are necessary in order to maintain a viable population. Do we know what the acreage is after the fire under the current plan? We do not know the acreage numbers for the planning area, which is what is required when assessing the viability of a species. And their insistence that the 2007 MIS amendment somehow changed all this and somehow alleviates them from actually- Well, let's forget the 2007 amendment for a minute. Well, I thought that would be nice. Let's try to answer Judge Biby's question, which is what is it that they were supposed to have done under your view that they didn't do? Okay. You're saying you started to answer, and I think I understand so far, you think that they're supposed to tell us what is necessary for the survival of the species. Maybe before the fire, the species would not have survived. Maybe. Maybe before the fire, the species was fine. You're saying that they should tell us how many burned areas you need for the survival of the species, how many acres, is that it? Yeah. I'm actually not telling you. I'm telling you that this is what the law requires. Okay. The law requires that they assess, that they determine in the planning area, which in this case is the entire Sierra Nevada. There was a forest plan amendment that amended all 11 national forest plans in the Sierra Nevada. They need to determine the quality and quantity of habitat in the planning area that is necessary to support a minimum viable population of native vertebrate species, in this instance, the blackback woodpecker. And this requirement stems from section 219.19, and I'd really just like to read this for you because it kind of in and of itself contains a definition. Defense counsel is up here saying, well, viable, you know, it can mean different things. No, it actually can't. This provision was specifically incorporated into the Plumas National Forest Plan. The use of the term viability is a unique term of art. So with your indulgence, I will read this short paragraph. Fish and wildlife habitat shall be managed to maintain viable populations of existing native and desired non-native vertebrate species in the planning area. For planning purposes, a viable population shall be regarded as one which has the estimated numbers and distribution of reproductive individuals to ensure its continued existence is well distributed in the planning area. In order to ensure the viable populations will be maintained, habitat must be provided to support at least a minimum number of reproductive individuals, and that habitat must be well distributed so that those individuals can interact with others in the planning area. That is the definition of viability. This is the place where all the case law on this issue. And what were you quoting from? I was quoting from Section 219.19. It's 36 CFR 219.19, and it's the 1982 regulations. These were specifically incorporated into the Forest Plan, and that's in our brief at page 13 in the reply brief. So let's take that we have almost no time, so let's get down specifically. Okay. You say they didn't determine how much, what, how many birds are required to make it viable? Well, there's two ways to ensure viability. One is to actually go out and count the birds, okay? But you need to figure out how many birds you need to have a viable population. So there's conservation, biology, literature that indicates if you have a certain number of individuals, then they have the chance to persist into the future, okay? And Dr. Chad Hansen prepared this type of analysis and submitted it to the Forest Service, who said we disagree and then failed to make any findings of their own. So that's all in the record. You need the minimum of 1,000 birds to survive to ensure the viability of the bird. Then you have to do what else that you think they didn't do? Well, you either have to count the number of birds, figure out how many you need, or you can use habitat as a proxy if you have a clear connection between the habitat and the bird, if there's a clear relationship. So you need to figure out, okay, each bird needs X number of acres to survive. And so then you can take that number and say, okay, well, if each bird needs 500 acres to survive and we need 1,000 acres, I mean 1,000 birds, then we need 500,000 acres of farm forest. You say 500,000, you mean the total size of the forest or the birds or what? When I say size, how much habitat is needed? Yeah. I'm talking about how much habitat each bird or each breeding pair needs to survive. Habitat, what do you mean? I mean, yeah, acres of forest, acres of suitable habitat. In this case, acres of severely burned, mature forest. Okay. That's what I was trying to find out. Habitat for these birds is the burned forest area? Yes. It's the only place they live. It's the only place they survive. They're uniquely designed to be there. One thing that has occurred to me in studying this is what if this burned area doesn't provide enough? What do we have to do, go start some more forest fires? No, but what we definitely have to do is not log it, not remove 12,000 acres of prime habitat for this species, and then I think nature can handle the rest. I mean, the Sierra Nevada is an ecosystem that is a fire-dependent ecosystem. Fires will burn. They'll be more. And as long as we maintain it on the landscape, these creatures and every other species that they're a bellwether for has a chance of surviving. Thank you. Okay. This case is adjourned. It will be submitted. The Court will stand in recess for the day. Thank you.
judges: Hug, Reinhardt, Bybee